Larry WILLIAMS, Plaintiff–Appellant,

v.

DEPARTMENT OF BUILDING DEVELOPMENT SERVICES OF THE CITY OF SPRINGFIELD, and Board of Adjustment of the City of Springfield, Defendants–Respondents.

No. 27330.

Missouri Court of Appeals,
Southern District,
Division Two.

May 30, 2006.

Jack Hoke, Springfield, for Appellant.

Thomas E. Rykowski, Springfield, for Respondents.

KENNETH W. SHRUM, Presiding Judge.

This case involves the Springfield, Missouri, zoning code and its application to an auto salvage business owned by Larry Williams ("Plaintiff"). A 1995 zoning

change would have prevented further use by Plaintiff of his land for a salvage yard but for the "grandfather" provision. Because Plaintiff had conducted a salvage yard at this site before rezoning, he was able to continue the business after rezoning as a "legal nonconforming" use. With the property in that status, Plaintiff added to his building without a permit in 1997. Thereon, the Department of Building Development Services ("DBDS") declared the property a nuisance and ruled Plaintiff could no longer operate his business under the "nonconforming use" zoning provision.

The decision of the DBDS was affirmed at every stage, i.e., before Springfield's Board of Adjustment ("Board") and by the circuit court. Plaintiff's appeal to this court followed. We affirm.

 This court reviews the decision of the Board, not the judgment of the circuit court. *Wolfner v. Board of Adjustment of City of Warson Woods*, 114 S.W.3d 298, 301[1] (Mo.App.2003). Moreover, "[t]he scope of our review of a board of adjustment decision is limited to determining whether the decision was authorized by law and supported by competent and substantial evidence upon the whole record." *Id.* at 301[2]. Although the interpretation of a city ordinance is a question of law, the interpretation given to the language by the body in charge of its enactment and application is also entitled to great weight. *HHC Medical Group, P.C. v. City of Creve*

*Coeur Bd. of Adjustment,* 99 S.W.3d 68, 71 (Mo.App.2003).

In April 1969, the property where Plaintiff operated his business was zoned "M–2, heavy manufacturing" which permitted salvage yards. Zoning ordinance amendments adopted in March 1995 reclassified Plaintiff's property to "HM, heavy manufacturing." That classification permitted "junk, scrap, salvage or automobile wrecking yards but only if they [were] located more than 500 feet from a residential district." There is no dispute that Plaintiff's property violated the distance requirement imposed by the March 1995 zoning change. Similarly, there is no dispute that Plaintiff operated his salvage business at this site for many years before rezoning; consequently, he could have a salvage business at that location after rezoning because of the "legal nonconforming use" provisions of City's ordinance.[1]

In 1997, Plaintiff decided to add to his building, but failed to get a building permit for the new construction. Sometime later, DBDS received a complaint about the addition. Thereon, DBDS notified Plaintiff that such construction without a permit constituted a nuisance in violation of the City's code. Plaintiff candidly admits that adding to his building without getting a permit was a nuisance violation.[2]

Under the zoning ordinances, Plaintiff's legal nonconforming use was terminated due to the nuisance violation.[3] DBDS notified Plaintiff of its decision, required him

---

1. "Nonconforming use" is defined by the City's code as "[a] use of land that does not comply with the use regulations for its zoning district but which complied with applicable regulations at the time the use was established."

2. Apparently, City's code defines "nuisance" as a structure built in violation of the building codes. Construction of a building addition without a permit would violate building

codes; consequently, City's classification of Plaintiff's 1997 building addition as a "nuisance" was never challenged by Plaintiff as being incorrect.

3. Section 5–1704(L) provides: "The right to continue a nonconforming use is conditional and may be continued for only so long as the nonconforming activity is conducted lawfully and does not produce a condition which constitutes a nuisance."

to cease his business operations within 30 days, and notified the City's business licensing department for possible revocation.

During the review hearing before the Board, Plaintiff testified as to why he believed the DBDS erred. He asserted that his business operations could not be considered a "nonconforming use" because he was never notified that the zoning ordinances were amended, i.e., he was never notified that his salvage business became a nonconforming use when his land was rezoned. The Board rejected Plaintiff's reasoning and the appeals followed.

■ The essence of Plaintiff's sole point on appeal is an issue of notice. Plaintiff argues that when the zoning change was enacted in 1995, the City, the Board, or DBDS was required to send him written notice that his business operations constituted a legal nonconforming use. Essentially, he claims that as a prelude to classifying his property as "nonconforming," the City had to give him written notice that his continued use of his property as an auto salvage business (after the 1995 rezoning) would be a "legally nonconforming" use; he was never given such notice before the "nuisance" adjudication; and, as a consequence, the City could not prevent him from continuing to operate a salvage yard under the "legal nonconforming" use exception, given the fact that he had removed the offending building addition. We disagree.

■ "The term 'nonconforming use' means a use of land which lawfully existed prior to the enactment of a zoning ordinance and which is maintained after the effective date of the ordinance even though not in compliance with the new use restrictions." *Rose v. Board of Zoning Adjustment Platte County*, 68 S.W.3d 507, 515 (Mo.App.2001). The prior use establishes a vested property right, and a new or modified ordinance may not be applied to require cessation of that use. *Storage Masters–Chesterfield, L.L.C. v. City of Chesterfield*, 27 S.W.3d 862, 865[8] (Mo.App.2000).

■ "The theory behind the nonconforming use doctrine is that applying new zoning restrictions to established uses of land would constitute a taking of private property without just compensation or due process." *Id.* at 866. As such, the prior use which is now considered "nonconforming" is deemed legal or lawful and is allowed to continue albeit in violation of current zoning laws. *Rose*, 68 S.W.3d at 515; *Storage Masters-Chesterfield*, 27 S.W.3d at 865–66; *Outcom, Inc. v. City of Lake St. Louis*, 996 S.W.2d 571, 575 (Mo.App.1999).

Sections 89.050 and 89.060 provide for notice and hearing requirements to interested parties before a zoning regulation can be enacted or amended.[4] *Moore v. City of Parkville*, 156 S.W.3d 384, 389 (Mo.App.2005). Plaintiff has never claimed that City's zoning ordinances failed to meet the statutorily mandated notice and hearing standards for zoning amendments, nor has he ever argued that the procedure established by City's ordinances for zoning change was not followed in this instance.[5] Accordingly, once the

---

**4.** All statutory references are to RSMo (2000), unless stated differently.

**5.** Section 89.050 provides, *inter alia*, that no zoning "regulation [or] restriction [or] boundary shall become effective until after a public hearing in relation thereto, at which parties in interest and citizens shall have an opportunity to be heard. At least fifteen days' notice of the time and place of such hearing shall be published in an official paper or paper of general circulation in such municipality." In a similar vein, section 89.060 mandates that the hearing and official notice requirements

ordinances were validly enacted, Plaintiff was deemed to have notice of the existence and content of those regulations. *Schnuck Markets, Inc. v. City of Bridgeton*, 895 S.W.2d 163, 168 (Mo.App.1995); *Rose v. City of Riverside*, 827 S.W.2d 737, 738 (Mo.App.1992). Succinctly stated, "[e]very property owner in a city is charged with notice of the city's zoning ordinances." 101A C.J.S. *Zoning and Land Planning*, § 16 (2005).

As applied here, this simply means that when the City followed the procedure established by its ordinances to change the zoning of Plaintiff's property in 1995, he (Plaintiff) was deemed to have notice of (a) the zoning change; (b) the fact that his property became nonconforming upon the effective date of the zoning change; and (c) that his right to continue a nonconforming use was conditional and could last only so long as the nonconforming activity was lawful and nuisance free. *Schnuck*, 895 S.W.2d at 168; *Rose*, 827 S.W.2d at 738; *see also* n. 3. To the extent Plaintiff claims he was entitled to written notice of the changes in the zoning ordinances because he was entitled to *actual* notice, such notion is refuted by the above-mentioned principles.

In so finding, we do not ignore section 5–1706(B) of the City's code nor do we ignore Plaintiff's claim that this provision supports reversal of the Board's decision. That ordinance section provides, in part: "Notice. The owners of record of all properties containing a use or structure that are deemed to be nonconforming shall be given written notice of that fact by the Director of Building Regulations."

Plaintiff argues the City never gave him the minimum written notice required by section 5–1706(B) that his salvage business became a nonconforming use once the March 1995 zoning change was made. He insists that without the section 5–1706(B) written notice being given, he was not put on notice that any violation of section 5–1704 would lead to a termination of his right to operate a salvage yard at that site. With his argument thus structured, Plaintiff asserts the City's failure to give him the written notice mentioned in section 5–1706(B) violated his due process rights "in that the minimum notice [Plaintiff] was entitled to was the notice required by the ordinance."

This argument misconceives and ignores the purpose and context of the section 5–1706(B) ordinance provision. The subject matter of section 5–1706 is "Occupancy Certificates for Nonconforming Uses." That ordinance section includes these pertinent provisions:

"A.　Survey. As soon as practicable after the adoption ... of any ... ordinance which renders nonconforming any previously lawful use or structure, the City Council shall use its best efforts to survey potential legal nonconforming uses for the purpose of making a permanent record of the existence and extent of such uses.

"B.　Notice. The owners of record of all properties containing a use or structure that are deemed to be nonconforming shall be given written notice of that fact by the Director of Building Regulations. Within ninety (90) days after the receipt of such notice said owners of record shall submit applications, on forms made available in the office of the Director of Building Regulations for a certificate of occupancy for any nonconforming use or structure.

　. . . .

of section 89.050 must be met before a municipality makes any changes or amendments to municipal zoning regulations, restrictions, or boundaries.

"**D. Effect of Occupancy Certificate.** Issuance of a certificate of occupancy ... shall be deemed to establish conclusively that the use in question was a legal nonconforming use, and the extent thereof, as of the date of the occupancy certificate.

"**E. Failure to Apply.** If any owner of a nonconforming use or structure fails to apply for a certificate of occupancy in the manner set out above, such use shall be presumed to be illegal until such time as the property owner establishes the legality of the nonconforming use in a proper procedure before the Board of Adjustment."

When read in context, it is clear that giving the section 5–1706(B) notice was not a prerequisite to the City amending its zoning ordinances. It is equally clear that City's failure to give a section 5–1706(B) notice to Plaintiff did not prevent City from terminating Plaintiff's right to continue the nonconforming use once he produced a condition that constituted a nuisance, i.e., when he added to his building without a permit. This follows because the goal for section 5–1706 was to make a record of legally nonconforming uses in the City of Springfield, and to do so as soon as possible after the legally nonconforming use arose.

To accomplish this goal, the City Council was directed to make a survey of nonconforming uses. § 5–1706(A). The notice contemplated by section 5–1706(B) was simply part of that survey effort. It may be that City's failure to give Plaintiff the section 5–1706(B) notice led to Plaintiff not being part of the survey. As such, Plaintiff may not have applied for and received a nonconforming use certificate of occupancy. Moreover, there may be no record

that establishes conclusively that Plaintiff's auto salvage yard was a legal nonconforming use or that shows the extent of the legal nonconforming use.[6] Had the City tried to terminate Plaintiff's nonconforming use of this property for these reasons, i.e., no certificate of occupancy or no record establishing the property's status as a legal nonconforming use, or because City misconceived the extent of the legal nonconforming use, then Plaintiff's position might arguably have merit. That, however, is not what happened; consequently, those are non-issues in this case and the lack of a section 5–1706(B) notice is of no consequence.

Neither the notice referenced in section 5–1706(B) nor the occupancy certificate mentioned in section 5–1706(D) has any bearing on *when* a property becomes nonconforming. Neither do they have any bearing on whether the nonconforming activity produced a condition which constitutes a nuisance, such as adding on to the building without a permit. The only issue here is whether Plaintiff knew or can be deemed to have known that his auto salvage business was a legal nonconforming use when he enlarged the building without getting a permit. For reasons explained earlier, the answer to that question is "yes." *See Schnuck,* 895 S.W.2d at 168; *Rose,* 827 S.W.2d at 738. Point denied. The decision of the Board is affirmed.

GARRISON, J. and BATES, C.J., concur.

---

**6.** We can only speculate about the absence of such documents because the record is silent

on that issue.